arguing it's not to exceed 15 minutes for each defendant, 25 minutes for plaintiff, Mr. Shadd, arguing first for the appellants. This is Judge Rogers. I want to make sure everyone can hear everyone else. Mr. Shadd, are you there? I am here.  I am here, Your Honor. I am here, Your Honor. Your Honor, I'd like to reserve three minutes for rebuttal. So what's that, 12 minutes? 12, yeah. Oh, okay, thank you. Please proceed. Thank you, Your Honor. May it please the court, here representing Mr. Firempong, who is a defendant in the court below. And the issue which I'd like to address the court's attention to today, and I'd leave the balance of the issues that I raised in my brief to the brief, unless there are any specific questions. But the issue that I want to address to the court's attention today is the Rule 801 issue, and that is the admission of Scott Herman's letter towards the end of evidence in this case. We would submit that the letter was not admissible under Rule 801 D-1B because it was not made to rebut a charge of recent fabrication at all. As a matter of fact, our argument is a couple of things. One, that the letter itself was made at a time where Mr. Herman already had the motive to fabricate, and thus the motivation to fabricate at trial was the same exact motivation that he had to fabricate at the time that he wrote the letter. And therefore, he couldn't have fallen under Rule 801 D-1B in any of them. Secondly, we would submit that the letter was improperly bolstered Mr. Herman's testimony and was inadmissible for that purpose as well. This is Judge Delano. We have a question. Assuming that we agree with you that the admission was improper, given the quantum of evidence and the other qualitative evidence that came in the case, how is your client injured such that the admission of the letter is not Herman's error? Well, you have to remember, Judge Donald, that out of this multi-week trial, there was only one witness that said that Dr. Phirenhong had used, possessed, or dealt in cocaine, and that was Mr. Herman. Therefore, the government brought in a litany of witnesses that were involved in the drug conspiracy, including the top dog himself, Mr. Jackson, who was friends with Dr. Phirenhong, and no other witness testified that Dr. Phirenhong was involved in drug trafficking in any way whatsoever. Was there other evidence, though, regarding the purchase of the mobile home and its uses to transport drugs? Absolutely. But you have to realize that there was evidence that Dr. Phirenhong had purchased the RV. I don't think that was seriously disputed in trial at all. But Mr. Jackson even testified that at the time that he had Dr. Phirenhong purchase the RV, he didn't tell them that it was for drug trafficking, and the doctor, in fact, didn't know that it was going to be used for drug trafficking. So there was a disconnect with the purchase of the RV and its tie to drug trafficking. The only person that there's any discussion at all about that ties Dr. Phirenhong to drug trafficking is Mr. Herman, who was a jailhouse informant that apparently Dr. Phirenhong knew for a total of two weeks that the OKC transfers him. And so you contend that his testimony, well, that the letter was just improper bolstering and was just inadmissible hearsay? That's absolutely true. Okay. You may be excused. Yes. Judge Griffin, do you admit that the letter, the information in the letter was cumulative evidence that the evidence came out, had come out already? Well, I wouldn't say that it's cumulative because it was... What's new about it? What new evidence came out in your letter that wasn't already in the evidence? Well, there's a couple things that came out that weren't in the actual testimony of Mr. Herman. And that was that it was addressed to the assistant United States attorney that he indicated that in the letter that he was doing this so that he could get some relief on his case. And he actually says in the letter to contact the assistant prosecutor out of the central district of Illinois so that they could quote unquote make a deal. So that didn't come out during his testimony. But I think over and above that, there's a difference between, well, there can be a difference between corroborative testimony or evidence and cumulative evidence. I do agree that in terms of the guts of the evidence, in terms of what he testified to that allegedly Dr. Byron Bogdan told him, that it was consistent with what he said during the trial of the case. But that's kind of the whole point of my argument here. And that's what differentiates it from being merely cumulative evidence. Because Herman was shown during cross-examination to be someone who fabricated stories. He had had these instances where he was trying to get a competency hearing and dodge his criminal charges that way. He had prior convictions relating to dishonest dealings. And so the whole point was that you can't trust Scott Herman because he is someone who will lie and fabricate. Well, this letter was a direct attempt to show, no, he is not a fabricator. Look, he said this way back at the beginning. The part that was skipped over was, well, of course he had a motive to fabricate when he wrote the letter as well. And that's kind of what was really analyzed by the court. But it's not really cumulative because it goes to the heart of whether or not the jury should have believed Scott Herman in this case. And if the jury doesn't believe Scott Herman, I don't think that there's any way that you can tie Dr. Byron Bogdan to the drug trafficking conspiracy in this case. If you are charging Herman with a recent fabrication, aren't they allowed to rebut the charge of recent fabrication by bringing in evidence to rebut that charge? Isn't it admissible on that basis? Well, there's two things. Number one, you're right. There has to be a charge of a recent fabrication. But number two, the time the original statement was made, the motive for fabricating needed to have not been there. That's what the case law says. The tone case and the toning case out of this jury. And so neither of those were present in this case because the defense in this case alleged that Scott Herman was lying from the beginning. And so it isn't a charge of recent fabrication. It's just a charge of direct fabrication. And that's a huge distinction here that separates this from 801 D-1B. If you look at the toning case, it even kind of delineates that a little bit more. It talks about, well, not every instance of alleged fabrication falls under this rule. It's only when it is a recent fabrication where something has changed to then make them say that they're fabricating a deficit. But this is Judge Rogers. It only needs to be an implied charge of recent fabrication. Absolutely. But in this case, Judge Rogers. So could the reason for fabrication sort of grow on it? Or does any possible charge of prior fabrication mean that you can't deal with some increase in the need to more recently fabricate? Well, I think you're right in that in theory, yes, there could be a kind of a growing recent fabrication. But that's not in fact what occurred in this case because if you go back to… But it could be implied that that's what's occurring. Absolutely not. Because if you take a look at the actual language of the letter that was written into the evidence, and it's found on pages 78-27 and 78-28. At the time he writes this letter, Mr. Herman, he's writing to an AUSA, and he's writing to an AUSA to provide information about Dr. Feigenbaum. And he specifically says in the letter that he's doing this so he can perceive a benefit. And he actually contacts them and says, here's his attorney's name, here's the assistant U.S. attorney in his case, meaning Mr. Herman's case, and that he's willing to testify if an agreement can be made with all parties. So his motive for fabrication was present at the time that he wrote that letter, and it didn't change at all by the time he got to trial in this case. It's the same exact motivation for fabrication. This is Judge Arnold. Aren't you allowed – well, given that all that's contained in the letter, you get to argue that this whole thing was designed to help him get some kind of a benefit and actually able to use that to show bias. And if that's the case, why is, again, this error simply harmless? Well, I agree that you can make that argument to the jury, but here you have – you have a multi-week trial, and when you read the transcripts, Dr. Feigenbaum is not even mentioned for the first, I believe, six days of the testimony. So the jury is not even hearing anything related to Dr. Feigenbaum for six whole days. And then you have on – I think it's the eighth day is when you have Herman, and that's the very first time on the eighth day of trial that you hear Dr. Feigenbaum tied to actual cocaine possession or cocaine distribution. So by the time we get to the tenth day of trial, which is two days later, then you have this letter that's written to the – or read to the jury, and, of course, it's divided by two days. Actually, you know, in theory, it would have been good for the judge to rule on it, so it all could have been during cross-examination and redirect, but instead it's kind of emphasized because now it's near the end of the – it's near the end of the direct evidence in this case, and it's made – it gives a second opportunity for the jury to hear this testimony. You know, I point out that, you know, the government obviously intended – thought that this evidence was something that they needed because they asked for it, and they actually asked that the letter be read through, quote, unquote, dramatic reading, whatever that meant. But they obviously placed a lot of hope on this letter being read to the jury as being important to the jury's decision. If not, then they wouldn't have asked that it be done. And, again, it is the only evidence that ties into any kind of drug possession or drug trafficking. It's – Well, Mr. Shadd, this is Judge Rogers. There is evidence about the purchase of the car for various bag loads of cash, isn't there? I mean, it's – Absolutely, and that goes to the money laundering conspiracy. I see my time has expired. Well, you're laundering money because you know that it's drug money usually. I mean, this is the case. I mean, there's not so much laundering of money that's not – Sure, if I can answer that question even though my time has expired. Yeah. It kind of gets to one of my other – that gets to one of my other arguments, which is I don't think – you can't conflate the money laundering conspiracy in this case with the drug trafficking conspiracy. They're obviously not the same thing. They're two different charges. And true, there is evidence that he laundered money for Mr. Jackson, but even Mr. Jackson testified under oath that he – that Dr. Feinbaum knew nothing about the drug trafficking side of that money laundering enterprise. And – And the other question I have is you cited pages 78, 27, and 28. Is that the page ID number or – Yeah, it's the page ID number. What are you throwing on that? I'm looking at that. I don't know what I'm supposed to be seeing there. 78, 28. You look at that and it's page 27, 83 of the actual transcript. Right, right. And you look at, like, line 7. It starts with line 7, I'm currently incarcerated, and then through line 14. And that talks about how he's doing this so he can get a benefit in his case. And he even identifies, here's my U.S. attorney that I'm dealing with. Here's my attorney. It shows that he has – If this kind of information is beneficial, I would be willing to testify. I'll stand to his statements if agreement can be made with all parties. Right. I'm not seeing what you're getting from that. Well, what I'm getting from that is he has – the motivation that he had when he wrote that letter, right, is the same exact motivation that he had when he took the stand at trial. So his motivation to fabricate was the same at the time he wrote the letter as the time he took the stand at trial. And so it's not a quote-unquote recent fabrication. It's the same that occurred from the time he had that information until the time he took the stand. And that recentness is essential to your point. It's recent. It's essential to data 1D. It's not recentness. It's essential to your point. Right, right. Exactly. Okay. Thank you. Thank you. I guess we're going to hear from Mr. Lawrence now. Good morning. Honorable judge. Yes. I'm Gerald Lawrence, representing Mr. McRae. Excuse me. We're having a little trouble hearing you. This is Gerald Lawrence, representing Mr. McRae. Good morning, Mr. McRae. This is a six-issue matter. I want to address the defendant's issues on two and five jointly. And this is Mr. McRae's position in regards to these two issues. A criminal act committed by Charles Hansel Barnett of attempted extortion, threatened assassination, of a government witness, Mr. Hodges, during the defendant's trial, together with other actions of malfeasance and misdeeds, rendered trial counsel ineffective for all representations during the defendant's entire trial in denying the defendant the Sixth Amendment right to effective representation. This is Judge Rogers. This is Judge Rogers. Ineffective assistance of counsel usually addressed on collateral attack rather than on direct appeal. That's part of the case law, Your Honor. The appellate court in Washington, D.C., held in U.S. v. Henry that a defendant who raised an ineffective assistance of trial counsel plaintiff for the first time on direct appeal. The general practice is to demand for a remedy to be heard. And that was in U.S. v. Warren and U.S. v. Verschetta. The Supreme Court is also in U.S. v. Massaro, and that's a ruling I sent in our own, indicates that defense warrant for the development of such facts is necessary for the trial. And I asked the court in this particular matter to consider that. Even though you referenced an evidentiary hearing and say that those matters are best handled in the trial court, doesn't that evidentiary hearing come in the context of a 2255 subpractical collateral matter? It doesn't come on direct appeal, does it? This is Judge Dominick. I think the general rule is here, Lawrence, an exception. It's not mandatory. We have a partial record, Your Honor. I didn't know that at the time that I filed the motion for a new trial and evidentiary hearing before Judge Maloney and our trial judge, because the in-camera theory of the threat of assassination, I didn't know at that time. But I did know that there was, on the part of Mr. Barnett, an extortion attempt, and I filed only that with the motion for a new trial, with the affidavits of Mr. Marlon Craig and his wife. But we do have a partial record, and we also have a great, heavy influence here of the actions on the part of Mr. Barnett to carry out his threat. If you don't pay me $50,000, Mr. McRae, I'm not going to bring a motion from this trial. And he did that also in the motion for this trial that he should have made for the 404B. So his actions or inactions speak for themselves. This is Judge Rogers. When was that information first brought to the district court's attention? What stage of the proceeding? Which, the extortion or the 404B? The extortion. The threat. Both. Your Honor, I'm not understanding. I want to know whether that was brought prior to conviction or after conviction or before trial. When in the trial sequence of the trial events was that information brought to the district court's attention? The information about the attempted extortion. And the information and the other information about the threat. What was the threat? The extortion was after trial. The extortion after trial. After trial. How was it brought to the court's attention? By way of the motion for the trial that was brought before Judge Maloney. The threat of assassination was known by Judge Maloney during the trial when he conducted an in-camera hearing for which he addressed the threat of assassination directly with Mr. Barnett after Judge Maloney had had a complaint for two of the other co-counsel who went to one of the other members of the bench and told of a conversation where they heard Mr. Barnett making a threat of assassination on government business grounds. And that was known to Judge Maloney during the trial. He did not tell, well, my client didn't know. My client didn't know about it until I received the transcripts in October of 2012. That was five, six months after I filed the motion for the evidentiary hearing of the extortion charge. I guess my questions go to when the district court should have acted and what the district court should have done and what you asked it to do when below, because I thought the ruling of the district court on these issues had to do with not enough evidence at that time to take action and, I guess, deferring it to any kind of collateral attack. Is that a fair reading of what went on? I think so. So basically the trial court decided that it was... Oh, go ahead. The trial court made a decision on the basis of only the allegations of extortion. And the trial court knew at that time about the assassination threat. It didn't divulge it to the defense at all. The trial court knew enough that it should have granted the evidentiary hearing. There was at least a charge for a court to believe that there was a threat of assassination because the court said in its in-camera hearing, Mr. Barnett, I'm going to refer this matter to the U.S. Attorney's Office. And I'm going to make a formal... I'm going to make a complaint where I'm going to speak to it that the Michigan Attorney's Discipline Board gets this information and takes into account this threat of assassination. The judge knew all of this and didn't divulge it to the defendant. The defendant, through his counsel, me, didn't know about it until after, five months after the court ruled upon the... and denied the motion for an evidentiary hearing. Your Honor, is that... Is that what I should say? You can proceed. Thank you. This entire argument, first argument, is really the most important. This motion for a threat and request for an evidentiary hearing is what we're asking for. The ineffective assistance of counsel's argument is that Mr. Barnett, throughout his representation, was ineffective. He committed felonies. We're not talking about not bringing evidentiary evidence. We're not talking about the Zimmerman case, this courtroom. We're not talking about falling asleep or not bringing... We're talking about a serious man. We're talking about a lawyer who not only is ineffective but has committed crimes during the course of a trial. That doesn't say, hey, that was his strategy. That wasn't something that's excusable. That's something that completely absolves him or checks him out as any kind of effective representation. He let his client down every inch of the way. And we are asking not to wait for a jury to testify. We're talking about 28 crimes here. Mr. Barnett has committed two felonies and nothing has been done, nothing has been done for my client to give him an opportunity to say that he was let down by a lawyer who did not represent him properly, who was only thinking about his pecuniary interests instead of representing him effectively. We're talking about a lawyer who's continuously gone on and done who knows what. We have a responsibility as lawyers, as judges, to protect the integrity of the criminal justice system. We haven't even done that. We haven't protected the rights of my client. I don't want to go another two years before we bring a 2255. I'm asking this court that there's such a circumstance, and there are such a circumstances here, to warrant a remand for an elementary hearing. I know what the general rule is, but there are other circuits that are not going by this general rule, and I'm asking this court to find something significant here, because it is significant, to let everybody know that we're going to protect the rights of a defendant. It's important here. I don't want to hear... I shouldn't have to hear about, well, there's this evidence and that evidence. This... Mr. Lawrence... Mr. Lawrence, this is Judge Griffin. Even if we agree with your position that our circuit should address issues of ineffective assistance of counsel on direct appeal as opposed to collateral review, does this panel have the authority to do so in view of our clear and binding precedent that this is a collateral matter? Language, the fact is, the word much. It uses the word... precedent. So, you know, you do have precedent in your... in our district to make this an issue. But there are other things to consider. I will take you to the point that one case where ineffectiveness has been brought in, a sick circuit, where you have a lawyer who's committed two felonies during a trial. One would know about... Counsel, this is Judge Rogers. It does sound egregious the way it's described, but the criteria that we usually use for deciding whether to hear a attorney misconduct on collateral attack rather than on direct appeal is that we hear on collateral attack if a hearing is necessary. And that more evidence needs to be brought in. That's sort of the criterion. So we'll hear it on direct appeal if the record is already sufficient to decide it, which is usually not the case. But here, you seem to be arguing that a hearing is necessary and, therefore, we should hear it on direct appeal. That sort of runs... that's sort of incoherent in terms of our doctrine of when it should go on collateral attack or direct appeal. Do you take my question? Do you see what I'm asking? I take your question. All right. Let's talk about the fact that there is a record that was made by Judge Maloney with Mr. Barnett. So there is a record of that. Right, but you're saying there needs to be a... You're saying there needs to be a hearing. There has... I think that... I wouldn't have any objection if you ruled effectiveness in our favor just as a matter of the threat of assassination. But if you don't, I say that there is at least a record on that and I believe that we should be granted a remand to make a further record on the extortion. And I think that there is enough that the court could use to support that in terms of what Mr. Barnett did and didn't do. He didn't make a motion for his trial. Two other counsel who really weren't related to any of the testimony of Mr. Hodgkin's case made the motion for his trial. Mr. Barnett did not. He didn't make the motion for his trial in terms of the 404B. The court can ask the question, did these two matters... Why didn't he do it? He didn't want a mistrial because he didn't want to have to retrial because he wanted $50,000 as he told my client, supported by their affidavits, my client and his wife's affidavits, that he's going to do it. Thank you. Mr. Lawrence. Mr. Lawrence, this is Jeff Rogers. I think if you want to reserve some rebuttal time, I think your time is up. Brett. Three minutes, Your Honor. Three minutes, Your Honor. Do you want to use your rebuttal time now or do you want to wait until after? Okay. Okay. Thank you, counsel. Mr. Fawson. Thank you, Your Honor. Jules Fawson on behalf of the United States. I'm here today to ask the court to affirm the conviction and sentences of both Fireman Pong and DeGray. I'm going to first address the issues as to defendant Fireman Pong. There was no motive to fabricate by Scott Furman at the time that he wrote the letter. The judge, Judge Maloney, down in the district court made the explicit finding, and it certainly was not clearly erroneous that the letter was addressed to whom it may concern. It evidenced that he had absolutely zero contact whatsoever with the United States Attorney's Office at the time he wrote that letter. And the faulty assumption of my colleague's argument is that he already had a motive to lie. Well, you know, he's saying, you know, I will testify if an agreement can be made, but even at trial, testimony was elicited by Mr. Herman that he had been promised nothing, and in fact, Mr. Herman testified that it was a great pain for him to have gotten moved so many times simply to become a trial witness. There's really no dispute that the substance of the letter corroborates other evidence that was admitted at trial, and it does it with exacting detail, absolutely exacting detail. Mr. Herman testified at trial that Jackson Sr. was using the alias of Candy, and that was elicited by Jackson Sr. himself. He mentioned the parties that took place at Jackson Sr.'s ranch house, and that was elicited by Charles Jackson Sr., as well as numerous photographs. It was clear throughout all of the testimony at trial that Charles Jackson Sr. was a massive, massive drug trafficking kingpin. You know, it was certainly implied by Firopong's counsel's cross-examination that he was fabricating out of stance, that he was attempting to lie in order to gain a benefit for himself. He teed that up by talking about his efforts to feign mental illness, which he was coached upon by Dr. Firopong when he went to the Metropolitan Correctional Center up near Chicago. And the implication through that cross-examination was that he was fabricating then and there at trial in order to gain a similar benefit. So the rule is clear that once you fabricate... What similar benefit? This is Judge Rogers. What similar benefit? Well, the implication was that he was lying in order to receive a sentence reduction. I think the implication... And he wouldn't have been lying to receive a sentence reduction at the time he wrote the letter. There was no guarantee whatsoever at that point in which he wrote the letter that the U.S. Attorney's Office would even call him to ask him to testify at trial. So you would say there's a reason for fabrication if he writes a letter hoping it will help him out, maybe shorten his sentence or whatever, and then when he's at trial, his hope is stronger. That's enough to be a reason for fabrication. Your Honor, I would say there is a reason for fabrication when a defense counsel at trial calls the witness a con artist and a liar, essentially, goes through a history of him attempting to feign mental illness, and then uses the cross-examination and makes the reference, but you're not lying today, are you? In a very sarcastic tone. I guess my answer... I understand. I've got that portion of the transcript in front of me, but I'm wondering whether this tone case that's cited suggests that if you're lying today for the same reason you lied when you wrote the letter, then it can't be admitted. You've got to have something that's fabricated more recently than the letter, right? Or does that case not say that? I don't think the case says that. I think the case says that if the fabrication is alleged between the time in which the testimony is enlisted at trial and the prior consistent statement, and again, I'll just get back to what the facts are in the record, and that's simply that I don't think it was clearly erroneous for Judge Maloney to find that he had had no prior contact with the U.S. Attorney's Office. There was nothing at that point in time suggesting that he was this con artist and that he was attempting to do all these things. And so at that point in time, Your Honor, I don't think there is a motive to lie because if every defendant who comes forth with evidence, because they all vote for Rule 35, if that is the key that automatically gives them a motive to lie, then there would be no admission in any court of any incarcerated witness as prior consistent statement because they're all voting for the same thing. What I want to jump to next, though, is... Why should there be prior consistent statements? Normally prior consistent statements aren't a hearsay, right? Correct. The jury should be listening to the current statement rather than some prior consistent statement, right? Correct. And the jury did hear it. And what I wanted to jump to next, Your Honor, is that Herman's testimony came in at trial without objection. It was absolutely consistent with what was in the letter. And essentially what Farmer Pong is asking you to do here is weigh the credibility of the witness, which there is doctrine in the Sixth Circuit that says appellate courts are not in the business of doing that. You know, there is the evidence of the alias, use of the alias name, the party at the ranch house, the fact that Jackson Sr. was a drug supplier. Pardon me, this is Judge Rodgers again. Have you moved away from the prior consistent statement issue? Now you're on another issue? I was just wrapping up with the fact that it would be harmless there. Oh, I understand. Okay. Ben would have been properly admitted in 801 D.B., under 801 D.1.B. Due to the fact that there was a letter. Before you move away from the letter, you said that Herman's testimony was entirely consistent with the letter. But, you know, in that case, doesn't that undercut the need to admit the letter? Because his testimony, which is supposed to be subject to cross-examination, and he is subject to cross-examination, the letter can't be cross-examined. And that would seem to bolster the defense counsel's intent to use the letter to corroborate or to bolster, which would be permissible. But what I'm arguing here, Your Honor, and I understand your question, is that Herman's letter wasn't the only thing that corroborated Herman's testimony. There was a lot of other evidence in the trial that corroborated Herman's testimony. It was, you know, again, the fact that Jensen Sr. was clearly a drug trafficker in Kingston. Herman recited in his direct testimony that he was aware that Jensen Sr. was using the alias cancer in his final sentence. The question is, since there's all this other evidence in the record, why is the letter, which is basically    there was a charge that Herman was fabricating his testimony. Okay. Now, I'm going to go back to the question that you asked earlier, which is why the court  submit the letter. Okay. And that's absolutely why we moved to request that the court submit the letter. So, I would simply wrap up this issue, Your Honors, by asking that the court not get into the business of weighing the credibility of the witnesses because clearly here, the jury believes Herman and to the extent that you do find that Judge Maloney erred under 801 D1B by admitting the letter, I request that you find it as harmless error due to the cumulative nature of the letter and the fact that there was, in fact, other evidence tying defendant Herman Ponds to drug trafficking conspiracy. And, in brief, I will just go over what that evidence is. You have the laundering of $200,000 so that you can purchase the vessel for Jackson Sr. that would be used to transport hundreds and thousands of kilos of cocaine from Los Angeles to Detroit. You have the... Is there any evidence, this is Judge Rogers, is there any evidence that Byron Ponds had any idea that the motorhome was going to be used for illicit purposes? I'm not sure the money he used he could  potentially illicitly, but is there any indication that he knew it would be used for illicit purposes as opposed to luxury? Absolutely, Your Honor. The evidence, again, this gets back to Herman's testimony, which was not objective to his trial. Herman testified that Byron Ponds admitted to him that he knew Jackson Sr. was a drug trafficker and was trafficking cocaine in large quantities. I understand that. I'm in any evidence other than the Herman testimony. There's nothing other than that. Is there direct evidence? Any evidence. Yes, there is evidence. What evidence? That evidence is Charles Jackson Sr. and James Dylan Haynes, who was  drug trafficker, had talked and discussed and planned that Byron Ponds would purchase his motorhome. You have Byron Ponds receiving the money to purchase the motorhome in a grocery stack, because he was aware that Charles Jackson Sr. was operating under an alias and was a drug trafficker. Essentially, Your Honor, it's a circumstantial case in terms of Byron Ponds' knowledge. But essentially... Right, but that, pardon me, I want to make my question clear. All of that, I can see how a jury member might infer that Byron Ponds knew that the money was going to be used for drug running. And I will get Your Honor to that guess. To finish up here on the evidence, when Byron Ponds and Jackson Sr. went to purchase and pick up the motorhome, Jackson Sr. drove it off the lot. There was then a transfer of title from Jackson Sr. to James Dylan Hayes, who then transferred that to Kevin Emerson. And there is evidence in the record, James Dylan Hayes visited Jackson Sr. on three occasions out in California. On one of those occasions, he met Dr. Byron Ponds. So Dr. Byron Ponds isn't merely associating with Jackson Sr. He's been meshing himself with him. And that becomes clear through the testimony of Scott Herman based upon Byron Ponds' own admission. The judge properly instructed the jury that this gave a willful blindness instruction. And this conspiracy was based on using motor vehicles to transport this currency over, through, currency to Los Angeles and cocaine in return in a cycle of drug trafficking and money laundering. And to wrap up on this point, Charles Jackson Sr. testified that he didn't really use this motor home at all for holiday travel. And that he lived just four houses away from Byron Ponds. So I think that the circumstantial evidence is quite strong that Byron Ponds was aware that this motor home was being purchased to further the conspiracy. You want to proceed to the arguments with respect to the other defendant? Uh, sure I will unless the court would like me to address any further issues at Byron Ponds here. Any questions about Byron Ponds, colleagues? I have none. No. Please proceed. Okay, sure. With respect to defendant McRae, counsel's entire argument on ineffective assistance is based on facts that lie entirely outside of the record. What I want to make clear here is that counsel for Farias and Byron Ponds approached Judge Maloney's chambers on one of the mornings of trial and said there was an issue. At that point, Judge Maloney directed those counsels to go meet with Judge Bell up in Grand Rapids. Judge Bell basically held a conference among those two counsels with McRae's counsel not present. Those counsels talked about what they heard and what they believed McRae's counsel's argument. Judge Bell never put them under oath, so testimony wasn't elicited in the manner that it would be elicited under a typical 2255 proceeding. Beyond that, even if the court did want to go ahead and entertain McRae's argument, he failed to show prejudice in any way. Here's why. He made two arguments with respect to 2255. One is that he was extorted and had to receive $50,000 or else counsel would have, you know, for counsel to move for a mistrial. Had Judge Maloney granted the mistrial, it would have been error because the portion of Tommy Hodges' testimony, and that was the witnessed edition, the portion of his testimony that he elicited and pled the fifth on, which was improper indication, simply went to his credibility. Mr. Hodges wore a wire in prison, I believe, if my memory serves, or he cooperated in some other substantial way, and McGrady's counsel said, I want to test him under cross examination, I want to, you know, expose to the jury that he's a walking tape recorder. In other words, implying that the jury can't believe him because he's just a jailhouse snitch and he's just in it for improper benefit. At no point in time was McGrady's counsel at trial precluded from cross examining, and he did a very lengthy cross examination on McGrady, or on Tommy Hodges, as to McGrady's actual act implicating him in the drug conspiracy. Counsel, this is Judge Bell, I have a question. Assuming that we accept Mr. McGrady's counsel's statement today that Mr. Barnett's actions in behalf of Mr. McGrady were totally undermined by his greed, if you will, his desire for punitive gain, and if in fact those statements are true and if Mr. Barnett actually committed felonies during the trial, such as refusing to be a zealotastic court client because he wanted to be paid $50,000, what results should obtain from this court? I mean, hypothetically, if some of those things are true, what ought the results to be? What action ought to occur, if any? Well, what I'm getting at here, Your Honor, and I think this answers your question, but if it doesn't, please leave asking. He can't satisfy the prejudice problem. McGrady's counsel, in terms of getting witness testimony entirely stricken from the record, was completely inadequate  effective. The testimony that Hodges had as to McGrady was extremely, extremely damning as to McGrady. Hodges was one of McGrady's best boyhood friends and testified that he saw him every day. And so he testified to a great deal about McGrady's knowledge and involvement in drug trafficking. You know, in order for the court to vacate a conviction, as you all are aware, on a 2255 grounds, there has to be an    in drug trafficking. The other thing is that beyond Hodges' testimony, you have James Hayes and Alvin Anderson testifying that they supplied McGrady with 10 to 20 kilograms of cocaine every month for the lifetime of the man who            Hayes and Alvin Anderson testified that they supplied McGrady   and Alvin Anderson   supplied McGrady with 10 to 20 kilograms of cocaine every month for the lifetime of the man who Hayes and Alvin Anderson supplied  supplied  with 10 to 20 kilograms of cocaine every month for the lifetime of the man who Hayes and Alvin Anderson supplied with 10 to kilograms of cocaine every   lifetime of the man